685 P.2d 1342

**Jerome C. HANSEN, Petitioner Employer,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Sandra J. Foster, Respondent Employee,**

**No Insurance, Respondent Carrier.**

**No. 1 CA–IC 3097.**

Court of Appeals of Arizona, Division 1, Department A.

June 14, 1984.

Jerome C. Hansen, in pro. per.

Sandra A. Day, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Lewis & Roca by Barry Fish, Phoenix, for respondent employee.

OPINION

CORCORAN, Judge.

We are called on to decide if the evidence in the record and the applicable legal principles support the Findings and Award of the Industrial Commission which concluded that respondent Sandra J. Foster's knee injury arose out of and in the course of her employment with petitioner Jerome C. Hansen, dba Ala Carte Players. The award of the Industrial Commission is affirmed.

On October 29, 1982, Foster slipped and fell, suffering a knee injury while on the physical premises of a Ramada Inn in Phoenix. Foster filed a claim for workers' compensation benefits alleging that her injury arose out of and in the course of employment with Ala Carte Players. After hearing, the Administrative Law Judge (ALJ) entered his Findings and Award concluding that Foster had sustained a compensable injury. Hansen filed this petition for special action. We have jurisdiction pursuant to A.R.S. §§ 23–943(H), 23–951, 12–120.-21(B) and rule 10, Arizona Rules of Procedure for Special Actions.

At the time Foster's claim arose Hansen, dba Ala Carte Players, was under contract to the Ramada Inn to stage dinner plays on Friday and Saturday evenings and occasionally on Thursday evenings or Sunday afternoons in an on-premises theatre especially designed for that purpose. The Ramada/Hansen contract gave Ala Carte Players the use of one or two of the Ramada's rental rooms as dressing rooms. Ramada ordinarily assigned the same dressing room, room 155, but on occasion would assign an adjacent room, room 157, without notice to Hansen. Hansen would find out about any changes only when he arrived for an evening's performance. Foster was aware of the occasional room changes.

In the fall of 1982 Foster auditioned for Hansen and was hired to act in one of the Ala Carte productions to be staged at the Ramada Inn. The production of the play "Small World" was rehearsed for three weeks, followed by four weeks of performances, before the allegedly compensable injury occurred. Foster testified at the June 1983 hearing that on the evening in question she was driven to the Ramada Inn by the Ala Carte musical accompanist. He dropped her off on the south side of the main building just in front of the cocktail lounge between 7 and 7:15 p.m. The performance, which was the first of that week, was scheduled to begin at 8:05 p.m. The dressing room was in a building in the Ramada complex to the north of the main building and was conveniently accessible from the northern portion of the parking lot. Foster testified that she did not go directly to the dressing room.

> THE APPLICANT: I went into the bar to say hello, for one thing, because it was our first performance for the week, and then to make sure the room was open so I could go on from there and begin getting ready for the performance.
>
> Q. [Foster's counsel]: Was the bar an area that you would normally walk through to get to the dressing room, and would it be a customary route, or a possible route?
>
> A. Yes, it was customary, because I always wanted to make sure somebody was there, instead of making an extra trip.

She also testified:

> I went into the bar of the restaurant and looked for Jerry Hansen. The reason for

that is that he usually had the key to the dressing room, and if he had not arrived yet, or somebody else had not arrived yet, I would just check in to see who was there, since I did not have a key. I spotted him in the bar, sitting at a table, and went and spoke with him for a few minutes, found out that the dressing room was open, and then continued on my way through the bar.

Q. [Foster's counsel]: Toward the dressing room?

A. Yes.

Upon entering the south door of the lounge she walked to Hansen's table, asked if the dressing room was open, received an affirmative reply and walked directly toward the north doors of the lounge. Before she reached those doors she slipped and fell, suffering the knee injury for which she claims compensation. Had she not fallen she would have exited the lounge into a hallway inside the main building and then proceeded toward the north of the Ramada complex where she would have exited the building to cross the parking lot to the dressing room.

Hansen testified that it was his normal and ordinary procedure to arrive quite early, 6:15 to 6:30 p.m., to open the dressing room and take care of other duties he had as the producer of the show. Once he finished these duties he would go to the lounge and stay there until about 7:55 p.m. at which time he would meet with the cast members near the stage for any last minute instructions. The record does not clearly show the regularity with which he frequented the lounge but it does support the conclusion that the lounge would be a reasonable place to seek him at the time of evening Foster arrived at the Ramada Inn.

While most cast members routinely parked near the dressing room they had not been told not to park in the front portion of the Ramada Inn parking lot, they had not been told not to walk through the lounge on their way to the dressing room, nor had they been told to go directly to the dressing room and wait there until it was opened if it was not already unlocked.

Hansen's past habits gave Foster adequate reason to expect to find Hansen in the lounge at the time she arrived. She also was aware of the possibility that the room might have been changed without her knowledge during the course of the week before the new performance was to start. Thus, Foster arrived within a reasonable time before the actual performance was to begin, sought out Hansen having an employment purpose in mind, and the facts show she was in a place one could expect her to be in connection with her employment taking a customary route of ingress that she could have reasonably been expected to follow before beginning her actual duties for the evening.

The controlling issue in this special action is whether Foster is entitled to workers' compensation benefits whether or not she was upon the physical premises controlled by her employer when she suffered her knee injury. We need not consider whether the ALJ was correct in characterizing Hansen's definition of his employment premises as "unduly restrictive," since the circumstances of Foster's injury place her claim within the range of risk exception to the premises rule.

Arizona courts have not previously addressed the specific issue presented in this case. In the following cases it was clear that the employee either was or was not upon the employer's premises when the injury occurred. *E.g., Pauley v. Industrial Commission*, 109 Ariz. 298, 508 P.2d 1160 (1973); *Sendejaz v. Industrial Commission*, 4 Ariz.App. 309, 420 P.2d 32 (1966); *Peters v. Industrial Commission*, 12 Ariz.App. 555, 473 P.2d 480 (1970); *Knoop v. Industrial Commission*, 121 Ariz. 293, 589 P.2d 1325 (App.1978).

■ A worker is entitled to workers' compensation benefits for injuries which both arise out of and occur in the course of the worker's employment. However, a worker may not recover for injuries sustained either while going to or coming from work. The so-called "going-and-coming" rule serves to restrict what is considered as either arising out of or occurring in the course of the employment. Its rationale is

that until the worker begins actual work activities or arrives at the actual work place, any risks of injury are just those which face the general public and are not peculiarly consequent from the employment. *Pauley, supra; Knoop v. Industrial Commission, supra. See McCampbell v. Benevolent & Protective Order of Elks,* 71 Ariz. 244, 248–49, 226 P.2d 147, 149–50 (1950) (refused to adopt the "premises" exception to the "going-and-coming" limitation, *overruled* in *Pauley, supra.*)

*Pauley* adopted an "on-premises" exception to the going-and-coming rule:

> We hold that when an employee is going to or coming from his place of work and is on the employer's premises he is within the protective ambit of the Workmens' Compensation Act, at least when using the customary means of ingress and egress or route of employee's travel or is otherwise injured in a place he may reasonably be expected to be.

109 Ariz. at 302, 508 P.2d at 1164. However, since Mrs. Pauley did not prove her injury occurred on the employer's temporary premises, the Supreme Court affirmed the Award of the Industrial Commission denying compensation.

*Pauley* adopted the "premises" exception "because compensation for industrial accidents is not dependent upon special risks or danger to which the employee may be exposed." 109 Ariz. at 301, 508 P.2d at 1163; *see* 1 A. Larson, *Workmen's Compensation Law* § 15.42 at 4–77 *et seq.* (1978) ("special risks", "special and inherent hazards", "perils of the employment"). Rather the source of injury need be merely

> ... sufficiently associated with the employment as to constitute a risk to which claimant was subjected in the course of her employment, and to which she would not have been subjected had she not been so employed.

*Royall v. Industrial Commission,* 106 Ariz. 346, 351, 476 P.2d 156, 161 (1970).

*Royall,* along with *Nicholson v. Industrial Commission,* 76 Ariz. 105, 110, 259 P.2d 547, 550 (1953) dealt with the "personal comfort" rule which treats activities such as

> ... getting fresh air, smoking, resting, eating food and ice cream, quenching thirst, using a telephone, toilet or other facility, washing and gathering up working clothes ... as arising out of the course of employment.

*Pauley v. Industrial Commission,* 109 Ariz. at 302, 508 P.2d at 1164 (citing *Royall*).

*Knoop v. Industrial Commission,* 121 Ariz. 293, 589 P.2d 1325 (App.1978) followed *Pauley* and *Royall* adopting a further exception to the going-and-coming rule. *Knoop* held that:

> ... the exception to the going and coming rule for travel across a public road between two portions of employer's premises is a reasonable exception, at least where, as here, the employee was told to park in the lot where she parked on the day she was injured. In this situation, petitioner was *subjected to the risk* involved in crossing 14th Street *as a result of her employment.*

121 Ariz. at 297, 589 P.2d at 1329 (emphasis added). *Knoop,* like *Pauley* and *Royall* before it, recognized that a worker's employment sometimes subjects the worker to risks "for injuries [not] in the actual performance of duties." 1 Larson, *supra,* § 15.42 at 4–79. Nevertheless these activities, e.g., walking from the parking lot into the factory, arriving early on the "premises" of the employer so to be at the worker's station at a precise time, crossing a public thoroughfare from the employer's parking lot to the employer's operating business premises, taking a respite for fresh air, using the telephone, the toilet or getting a drink of water, for example, are "sufficiently associated with the employment," *Royall v. Industrial Commission, supra,* because it is reasonable to expect that, in addition to actual performance of work duties, the employee will be engaging in such ancillary activities on the employer's premises because of the employment. *See Pauley v. Industrial Commission,* 109 Ariz. 298, 302, 508 P.2d 1160, 1164. Larson puts the matter this way:

> As to employees having fixed hours and place of work, injuries occurring on

the premises while they are going to and from work before or after working hours or at lunch time are compensable, but if the injury occurs off the premises it is not compensable, subject to several exceptions. Underlying some of these exceptions is the principle that course of employment should extend to any injury which occurred at a point where *the employee was within range of dangers associated with the employment.*

Section 15.00 at 4–3 (emphasis added). The attempt to manageably demarcate the appropriate "range of dangers associated with the employment" has, as Larson notes, resulted in a nearly unanimous adoption of a "premises" rule which includes both "positional" and "causal" components. *See* Larson, *supra,* § 15.42 at 4–80, –81. However, the term "premises" is misleading. The causal component of the premises rule dominates the positional component under the majority rule. One example of this domination is the extension of the premises rule (which is itself *an exception* to the going-and-coming rule, *see Pauley, supra,*) to injuries to workers which arise when a worker is travelling between two parts of the employer's physical premises, for example the parking lot which is separated from the main building by a heavily travelled public thoroughfare. *Knoop, supra; see* 1 Larson, *supra,* § 15.12 at 4–10. Since the employer does not have "control" over the public thoroughfare between two parts of his premises, that concept does not here limit the employer's workers' compensation liability.

■ Instead, the going-and-coming rule has been compromised by the rule that employees with fixed hours and places of work are covered, even while going to and from their actual workplace, if they are *on the employer's premises.* But at the same time it is clear that the premises rule is primarily a practical rather than conceptual solution to the difficult task of attempting in each particular case to decide whether the claimant was exposed to a particular risk because of his employment. *See* 1 Larson, *supra,* § 15.12. Thus, as Larson points out:

We have, then, a workable explanation of the exception[s] to the premises rule: It is not proximity, or reasonable distance, or even the identifying of surrounding areas with the premises: It is simply that, when a court has satisfied itself that there is a distinct "arising out of" or causal connection between the conditions under which the claimant must approach and leave the premises and the occurrence of the injury, it may hold that the course of employment extends as far as those conditions extend.

Larson, *supra,* § 15.15 at 4–42, 43. For example, where a claimant has been subjected to a particular risk because of his employment, Larson, *supra; Knoop, supra,* "the always-ill-fitting course of employment concept has got to be stretched at least far enough to prevent the injustice of denying compensation for an injury admittedly caused by the employment." 1 Larson, *supra,* § 15.15 at 4–42.

Larson, in applying these concepts, notes that:

As to parking lots owned by the employer, or maintained by the employer for his employees, the great majority of jurisdictions consider them part of the "premises," whether within the main company premises or separated from it. This rule is by no means confined to parking lots owned, controlled, or maintained by the employer. The doctrine has been applied when the lot, although not owned by the employer, was exclusively used, or used with the owner's special permission, or just used, by the employees of this employer. Thus, if the owner of the building in which the employer works provides a parking lot for the convenience of all his tenants, or if a shopping center parking lot is used by employees of businesses located in the center, the rule is applicable.

Section 15.41 at 4–62, –69, –70. Larson continues:

When the place of employment is a building, it is not necessary that the employer own or lease the place where the injury occurred. It is sufficient if he has some kind of right of passage, as in the

case of common stairs, elevators, lobbies, vestibules, hallways, walkways, driveways, or passageways through which the employer has something equivalent to an easement.

Section 15.41 at 4–74, –76, –77.

We now apply our analyses to the facts of this case. Hansen argues that both the causal and positional requirements of the premises rule were not satisfied when Foster fell, injuring her knee in the Ramada Inn lounge.

■ First, Hansen argues that Foster had no employment-based need to arrive as early as she did. Thus, he concludes her injuries did not arise out of her employment. At the Commission hearing Foster testified that it was necessary for her to arrive when she did to adequately prepare her costume and makeup for the performance. Hansen did not contradict Foster's testimony at that hearing. Therefore the record supports the ALJ's implicit conclusion that Foster's injury arose out of her employment. It was her employment that caused her to be at that location at the time of the accident and injury.

■ Hansen's second and more difficult contention is that the injury was not suffered in the course of Foster's employment: the positional nexus was not met, essentially because she had not yet arrived at her work place. Hansen argued to this court that Foster must have actually arrived on the doorsill of the dressing room before her workers' compensation coverage would begin for the evening. He draws this conclusion because he does not "control" any portion of the Ramada Inn's physical business premises other than the dressing room and stage area. As we concluded above, control is not the issue here. Rather the question to be answered is: was the claimant Foster injured on the employer's physical premises *or if not* was there a "distinct ... causal connection between the conditions under which claimant must approach and leave the premises and the occurrence of the injury ..."? 1 Larson, *supra,* § 15.15 at 4–42, –43.

We hold that in this case, although Foster was not on the physical premises con-

trolled by her employer, she was nonetheless within the range of risk causally related to her employment that would justify a compensable award for her injury. In short, Foster was where she might reasonably be expected to be in connection with the employer's work, *Pauley v. Industrial Commission,* 109 Ariz. at 302, 508 P.2d at 1164, using a customary or permissible route to her actual workplace.

The award of the Industrial Commission is affirmed.

Respondent Foster requests attorneys' fees for the reason that this appeal is frivolous and filed for an "ulterior motive." Foster does not specify the motive, but in any case we think this appeal is not one that "indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." *Price v. Price,* 134 Ariz. 112, 114, 654 P.2d 46, 48 (App.1982); *Clemens v. Industrial Commission,* 679 P.2d 509 (Ariz.Sup.Ct.1984). The request for attorneys' fees is denied.

GRANT, P.J., and FROEB, J., concur.